# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# PADUCAH DIVISION
# CASE NO. 5:08-CV-00114-R

**BARBIE KITTEL**                                                                                **PLAINTIFF**

v.

**C-PLANT FEDERAL CREDIT UNION, et al.**                                **DEFENDANTS**

## MEMORANDUM OPINION & ORDER

This matter comes before the Court upon Defendants' Motion for Summary Judgment (DN 42). Plaintiff responded (DN 44, DN 45) and Defendants replied (DN 54, DN 55). This matter is now ripe for adjudication. For the reasons that follow, Defendants' Motion is DENIED IN PART and GRANTED IN PART.

## BACKGROUND

This matter arises out of the termination of Plaintiff Barbie Kittel from Defendant C-Plant Federal Credit Union ("C-Plant"). Kittel began working for C-Plant as a teller on February 17, 2005. On September 26, 2005, she transferred into the collection department as a collection officer. C-Plant terminated Kittel on May 23, 2008.

Kittel was terminated following the completion of an examination of C-Plant by the National Credit Union Administration ("NCUA"). During the examination, examiner Wayne Finch met with Kittel to discuss two accounts ("the Accounts"). With regard to the first account, Kittel explained that she had "charged off" a member's checking account because it had been delinquent for more than forty-five days. After the member complained to C-Plant's CEO, Mark Atwood, Atwood instructed Kittel to reopen the account and float the member a loan to take care of the delinquency. Similarly, with regard to the second account, a member was given money to pay off a "charged-off" checking account, plus additional money. Kittel explained to Finch that

this was against credit union policy and was out of the ordinary.[1]

Felicia Shepard was the examiner in charge of the 2008 NCUA examination of C-Plant. During the examination, Shepard found that various employees of the credit union engaged in the improper practice of "rolling due dates" on delinquent loans. Kittel was one of the employees identified as having rolled due dates.

C-Plant states that Kittel was terminated for rolling due dates, specifically for rolling a due date on her brother's account, and as a result of pressure from the NCUA examiners. Kittel claims that she was terminated for reporting the improper transactions related to the Accounts.

Kittel's Complaint contains six counts: (1) retaliatory discharge under the Federal Credit Union Act, (2) breach of employment contract, (3) breach of implied covenant of good faith and fair dealing, (4) intentional interference with current business contractual relationships, (5) intentional infliction of emotional distress, and (6) wrongful discharge under Kentucky common law. All of the counts are directed toward C-Plant and Atwood in his capacity as an agent or employee of C-Plant, except for Count Four, which is directed only toward Atwood in his individual capacity.

---

[1] Finch testified that Kittel "brought the attention of two specific individuals, and which had previously been charged off and then the actual share accounts were reopened, without those accounts being satisfied, the ones that were written off." He said Kittel explained that this was against credit union policy because "before a share account will be reopened, the member must bring the prior account current, pay it up, pay all fees, the negative balance; and then on extenuating circumstances, the account may or may not be reopened." She stated that "normal individuals, members, would not be allowed to reopen their accounts, and this was out of the ordinary."

**STANDARD**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d

150, 165 (6th Cir. 1993).

## ANALYSIS

**A.    Retaliatory Discharge Under the Federal Credit Union Act (Count 1)**

The Federal Credit Union Act ("FCUA") provides as follows:

> No insured credit union may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee . . . provided information to the [National Credit Union Administration] Board or the Attorney General regarding any possible violation of any law or regulation by the credit union or any director, officer, or employee of the credit union.

12 U.S.C. § 1790b(a)(1). Accordingly, an employee may bring a retaliation action against an insured credit union pursuant to this provision. *See McNett v. Hardin Cmty. Fed. Credit Union*, 118 F. App'x 960, 963 (6th Cir. 2004) .

In order to establish a prima facie case of retaliation, Kittel must demonstrate: (1) that she engaged in protected activity; (2) that C-Plant knew of this exercise of her protected rights; (3) that C-Plant subsequently took an employment action adverse to Kittel; and (4) "that there was a causal connection between the protected activity and the adverse employment action." *McNett*, 118 F. App'x at 964 (citing *Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004)). If she satisfies this prima facie case, the burden shifts to C-Plant "to articulate a nondiscriminatory reason for the action taken." *Id.* at 965 (citing *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 184 (6th Cir. 2004)). If C-Plant proffers a legitimate nondiscriminatory reason for the adverse employment action, the burden shifts back to Kittel to show that C-Plant's stated reason was pretextual. *Id.* (citing *Mitchell*, 389 F.3d at 184). To do so, she must show either: "'(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the decision; or (3) that they were insufficient to motivate the employment decision.'" *Id.* (quoting

4

*Mitchell*, 389 F.3d at 184).

There is no dispute that Kittel engaged in protected activity when she told Finch about the two improper transactions. There is also no dispute that C-Plant subsequently took an employment action adverse to Kittel when it discharged her on May 23, 2008. Thus, the first and third elements of Kittel's prima facie case are satisfied.

C-Plant argues that Kittel cannot prove either the second or fourth elements of her prima facie case because she has not shown that C-Plant knew she reported information to the NCUA examiners. To satisfy this element on summary judgment, Kittel does not need to present evidence that C-Plant had actual knowledge about her meeting with Finch; Kittel must present a genuine issue of fact regarding whether (1) C-Plant had, in fact, realized that the NCUA examiners had been told about the Accounts and that (2) Kittel was the source of that knowledge. *See McNett*, 118 F. App'x at 964.

The Court finds that there is a question of fact as to whether C-Plant had reason to suspect that the NCUA examiners had been told by someone about the Accounts, based on Finch's testimony regarding a meeting he and Shepard had with C-Plant management. With regard to the Accounts, Finch testified:

> Q: Did anybody at C-Plant ask as to how you came across those two accounts? I mean, did Mark Atwood say, How did you find those two? Or, I didn't know about these two. Or did he say anything about those particular two accounts in that meeting?
> A: I do not recall him asking how we found out. I believe we stated up front that we had found it during the loan review. Because I believe two of the loans– or one of the loans was delinquent.

Finch's testimony on this point is unclear. For example, the Court does not know what the "loan review" entails and whether that includes the examiners interviews with employees. His answer

5

could be interpreted to mean that he and Shepard told C-Plant management that the loans were on the list to be reviewed because they were delinquent. His statement, however, could also be interpreted to mean that he and Shepard told C-Plant management that they had discovered the improper transactions when speaking with C-Plant employees. This at least creates an issue of fact as to whether C-Plant realized that the NCUA examiners had been told about the Accounts.

The Court finds that there is also a question of fact as to whether C-Plant had reason to suspect that Kittel was the source of that information. There is sufficient evidence that C-Plant knew Kittel met with Finch. C-Plant also knew that Kittel had reported the practice of improperly rolling due dates to co-workers in 2007. Additionally, in February 2008, Kittel was accused of insubordination by a senior C-Plant manager because she questioned the removal of a delinquent loan from an individual's personal credit report. This evidence shows that Kittel had a history of reporting and questioning improper practices at C-Plant. This evidence is not as strong as the evidence in *McNett*, but, inferring in favor of Kittel, it is enough to raise a question as to whether C-Plant had reason to suspect that she was the source of information on the Accounts. The Court makes this finding despite Shepard's testimony that C-Plant could not have found out that NCUA got the information on the Accounts from Kittel because neither she or Finch told them and because they included the loans on the larger list of loans they were planning to examine. Even if Shepard and Finch did not tell C-Plant that they got information on the Accounts from Kittel, C-Plant still could have had reason to suspect Kittel as the source.

Whether C-Plant had reason to suspect that the NCUA examiners had been told by an employee about the Accounts and whether C-Plant had reason to suspect that Kittel was the source is a very close call. C-Plant argues that it requires speculation and guess work. Needless

6

to say the conclusion is not crystal clear and does require some inferences. The Court believes a trial will add clarity to the facts and to any inferences. Simply put, the Court is uncomfortable at this time in holding there is no genuine issue of material fact as to the second element.

The Court also finds that Kittel has satisfied the fourth element because the decision to terminate her was made a week after C-Plant learned that the results of the NCUA examination had to be disclosed to C-Plant's bonding company. "While mere temporal proximity between an employee engaging in protected activity and suffering an adverse employment action is insufficient to demonstrate causation, the employer's knowledge of the protected activity coupled with an adverse action occurring close in time can create an inference of causation where the particular circumstances strengthen the inference of causation." *McNett*, 118 F. App'x at 965 (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)).

In its reply, C-Plant gives three justifications for terminating Kittel: "her practice of rolling due dates in general, rolling the due date for her brother, and the pressure from NCUA." These are legitimate nondiscriminatory reasons for the adverse employment action, so the burden shifts back to Kittel to show that they are pretextual. Kittel asserts that questions of fact remain as to whether C-Plants stated reasons have any basis in fact and whether they actually motivated Kittel's termination.

The Court finds that C-Plant's varying reasons for terminating Kittel raise a question of fact as to what reason actually motivated the termination. When Kittel was terminated, she was told it was for rolling due dates and for fear of C-Plant losing its bond. At the end of the meeting, Atwood also mentioned that she rolled her brother's account. In its Answer, C-Plant stated that Kittel was "terminated for cause after discovery of her actions in violation of policy

7

and law by the [NCUA] examiners and reporting of same to the management and board of [C-Plant]" and that she "failed to abide by and perform her duties pursuant to state and federal laws, despite having been instructed thereon." When asked by Kittel in an Interrogatory what laws she violated, Paul Adams, on behalf of C-Plant, responded that the "violation was insider abuse by rolling a due date for a family member." During his deposition, however, Adams stated that she "was terminated for rolling due dates" and conceded that she was not terminated for rolling a due date on a family member. Additionally, Carrie Childers, a C-Plant employee, testified that when she reported to C-Plant that Kittel had rolled a due date on her brother's account, the decision had already been made to terminate Kittel. Childers was told that the NCUA examiners recommended that four people be terminated. Shepards, however, testified that she did not recommend Kittel be terminated. In fact, she was told by Atwood and Adams that Kittel was not being terminated for rolling due dates, but for insider abuse related to her brother's loan. Even though Shepards stated that she was surprised Kittel was being terminated, Adams testified that he recommended Kittel be terminated due to the pressure from the NCUA examiners.

While Kittel may have been terminated for all three reasons that C-Plant asserts, its inconsistent responses raise a question as to what reason actually motivated the termination. Therefore, Kittel has satisfied her burden of presenting an issue of fact as to whether C-Plant's justifications are merely pretext for retaliation. Consequently, C-Plant is not entitled to summary judgment on Count One of Kittel's Complaint.

**B.     Breach of Employment Contract (Count 2)**

Kittel's initial employment with C-Plant was that of an "at-will" employee. In March 2008, Kittel states that she agreed to forgo a one-thousand dollar bonus in exchange for the

8

opportunity to earn a five-thousand dollar bonus, to be paid at the end of the year, if she kept the "delinquency rate" down to a certain level. Kittel asserts that this constituted an oral contract for a definite period of time, until December 2008. Thus, as a matter of law, the Court must determine whether an agreement to forgo an immediate bonus for a larger bonus at a later point in time constitutes a contract for a definite period. *See McNutt v. Mediplex of Ky., Inc.*, 836 F. Supp. 419, 421 (W.D. Ky. 1993).

"The duration of an employment contract must be determined by the circumstances of each particular case, depending upon the understanding of the parties as ascertained by inference from their written or oral negotiations and agreements, the usage of business, the situation and objectives of the parties, the nature of the employment, and all circumstances surrounding the transaction." *Shah v. Am. Synthetic Rubber Corp.*, 655 S.W.2d 489, 490 (Ky. 1983). "In Kentucky, an at-will employment relationship can be modified only if the employer clearly states an intention to do so." *Worden v. Louisville & Jefferson County Metro. Sewer Dist.*, 847 F. Supp. 75, 77 (W.D. Ky. 1994); *see also Hammond v. Heritage Commc'ns, Inc.*, 756 S.W.2d 152, 154-55 (Ky. 1988) (recognizing that at-will employment may be modified by oral contract). "[T]he employer must make a specific promise on which the employee relies and there must be mutuality of obligation." *Shah v. Gen. Elec. Co.*, 697 F. Supp. 946, 948 (W.D. Ky. 1988).

Even when taking the facts in the light most favorable to Kittel, C-Plant's offer to her to take either a one-thousand dollar bonus immediately, or a five-thousand dollar bonus at the end of the year, and her acceptance of the opportunity to earn the five-thousand dollar bonus, does not constitute a contract for a definite period of time. C-Plant did not clearly state any intention to modify her at-will employment status. Kittel has not explained how she relied on C-Plant's

9

promise to give her a bonus if the "delinquency rate" stayed at a certain level. And there was no mutuality of obligation because Kittel was not obligated to do anything. She could choose to take actions to reduce the delinquency rate or not. She could continue to work, or quit. Just as C-Plant made no guarantees to her that she would still be employed at the end of the year, she made no promises to C-Plant that she would still be around at that time. C-Plant gave her a choice between two bonuses; Kittel chose the riskier option. A contract for a definite period of time was not created by that deal.

Therefore, C-Plant is entitled to summary judgment on Count Two of Kittel's Complaint.

**C.      Breach of Implied Covenant of Good Faith and Fair Dealing (Count 3)**

Because the Court holds that no employment contract was created, there can be no breach of implied covenant of good faith and fair dealing. *See Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 791 (W.D. Ky. 2001) (covenant of good faith and fair dealing only arises from a contract). As such, C-Plant is entitled to summary judgment on Count Three of Kittel's Complaint.

**D.      Intentional Interference with Current Business Contractual Relationships (Count 4)**

Count Four of Kittel's Complaint is directed toward Atwood in his individual capacity. Because Kittel has not shown "the existence of a contract," Atwood is entitled to summary judgment on Count Four of Kittel's Complaint. *See Dennison v. Murray State Univ.*, 465 F. Supp 2d 733, 755 (W.D. Ky. 2006) (first element of tort of interference with contractual relations is the existence of a contract).

**E.      Intentional Infliction of Emotional Distress (Count 5)**

In Kentucky, to establish a claim for intentional infliction of emotional distress, the

plaintiff must prove the following elements: "The wrongdoer's conduct must be intentional or reckless; the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; there must be a causal connection between the wrongdoer's conduct and the emotional distress and the distress suffered must be severe." *Osborne v. Payne*, 31 S.W.3d 911, 913-14 (Ky. 2000) (citing *Craft v. Rice*, 671 S.W.2d 247 (Ky. 1984)).

Kittel claims that after she was terminated she suffered severe emotional distress. Specifically, she states that she was fearful of the consequences of being unemployed, cried a lot when she had trouble making ends meet, and was eventually prescribed antidepressants. The Court finds that this emotional distress is not "severe" enough to support a claim of intentional infliction of emotional distress. Emotional distress sufficient to support such a claim must be "so severe that no reasonable man could be expected to endure it." Restatement (Second) of Torts § 46, cmt. j. As the Supreme Court of Kentucky has stated, the tort is intended to redress behavior "which results in bringing one to his knees." *Osborne*, 31 S.W.3d 911 (citing *Kroger Co. v. Willgruber*, 920 S.W.2d 61 (1996)). Kittel has not presented evidence of this level of distress. She states that her claim is similar in nature to the plaintiff in *Kroger Company v. Willgruber*, but her alleged distress is not nearly as severe. In *Willgruber*, the plaintiff "had a dramatic, emotional breakdown" and a psychotherapist diagnosed him with "severe, disabling depression." 920 S.W.2d at 63. He was awarded disability benefits because he was unable to work. *Id.* He described years of his life "as a 'living hell'" and "recounted his physical sickness, emotional pain, inability to eat or sleep, his feelings of hopelessness and worthlessness, and when things became totally unbearable, his attempt at suicide." *Id.* This testimony was

11

corroborated by testimony of medical witnesses. *Id.*

The Court finds it difficult to discern what conduct Kittel claims is causally connected to the emotional distress she experienced. Regardless, she has not complained of distress severe enough to defeat C-Plant's motion for summary judgment as to Count Five of her Complaint.

**F.     Wrongful Discharge of Employment Under Kentucky Common Law (Count 6)**

Kittel does not contest summary judgment as to Count Six of her Complaint.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (DN 42) is DENIED IN PART and GRANTED IN PART. Kittel may proceed with her claim for retaliatory discharge against C-Plant and Mark Atwood in his capacity as an agent or employee of C-Plant. All other claims are dismissed.